v. McElroy Coal Company. Mr., is it Puz? It is, Your Honor, yes. Mr. Puz, we're glad to hear from you. Thank you, Your Honor. May it please the Court, my name is Roger Puz. I represent the appellant defendant in this case, McElroy Coal Company. Of course, McElroy Coal Company conducted mining operations under the plaintiff's property located in Marshall County, West Virginia. And the issues that bring us here today really are two, both rooted in West Virginia state law. And the first is whether the deed, the coal severance deed, pursuant to which McElroy had rights to mine the plaintiff's property, whether the subsidence waiver basically barred any common law action of the plaintiff. So you can address this as you go through your argument and your opposing counsel as well. Here's my initial concern I have in this case. You're certainly entitled to be in federal court, but it certainly looks like a case that was more appropriate in the West Virginia state court. You have a common law claim that you're just starting to describe, which deals solely with West Virginia law interpretation of a deed. So you have this district court's opinion, but cases from the West Virginia Supreme Court and other federal district courts in West Virginia that seem to consider similar language come out the other way. And then you have several issues under the West Virginia Surface Mining Act, all of which are questions of West Virginia law, not federal law. Who gets to make the choice about the remedies, the extent of the remedies? This just seems like, at least to me, on the surface, a case that's almost tailor-made for certification to the West Virginia Supreme Court of Appeals. So you might factor that into your discussion of the issues. I appreciate that, Your Honor. Those are excellent points. And I really think, to follow up, in my mind the question is why wouldn't we certify it? Your Honor, certainly the West Virginia SMACRA, the Regulatory Statutory Scheme, they're what really is a dearth of case law interpretation with regard to it. And we would submit that may be perfectly made for the West Virginia Supreme Court. At the same time, should this Court wish to consider those issues, the interpretive guidance, regulatory guidance, legislative history, and in particular the federal SMACRA scheme, for which there is a great deal of interpretive guidance because the Office of Surface Mining has been more active in terms of announcing its position, issuing regulations. But here we're dealing solely with the West Virginia statute and West Virginia regulations. We are. We are. We are. A statutory scheme that under West Virginia law is to be interpreted consistent with federal law. The second point I'd like to raise with regard to the common law issue, granted the West Virginia Supreme Court has not spoken with regard to the subsidence waiver in conjunction specifically to long wall mining, the mining technique that was used in this particular instance. But I would submit that the exact damage waiver that we are here today talking about is one that has been routinely interpreted by the West Virginia Supreme Court of Appeals. And I think it bears repeating because of how broad and definite it is. There was a conveyance in 1902 from the plaintiff's predecessor in interest, Strickler, to my client's predecessor in interest, Hobbs. 1902, conveyance of the Pittsburgh coal seam, which was the coal seam that was mined here, together with all rights and privileges necessary and useful in the mining. So we get the coal, we get the right to mine, continuing. And the removal of said coal, including the right of mining the same without leaving any support for the overlying strata and without liability for any injury which may result to the surface for the breaking of the coal. That's exactly what happened here. And whether it was 1902 when the miners may have been mining with picks and shovels, even over the ensuing 115 years where, granted, automation took place, efficiencies improved, recoveries improved, that language continues to be maintained by the Supreme Court of Appeals in West Virginia as definitive, unambiguous, and therefore enforceable. And that's what we have here. So was the concept of surface support different when you were mining in 1902 than it is today? I mean, I thought that there was a pillar concept and a room concept earlier that no longer is applicable now in longwall mining. That's very true, Judge Keenan.  Well, it really plays in the sense that, yes, room and pillar necessitated that. The miners had to leave the pillars in place for their own safety. Right. So if they were contemplating that when they executed the waiver, isn't that something we have to take into account, that it's a different thing that they were waiving with regard to surface support? I'd go back to the winnings decision, which we cite, the Oneida Coal case that we cite, that respectfully, Your Honor, the court doesn't need to get into the intent of the parties where the language used in the deed, 1902 deed, is clear and unambiguous. And here, the language in the 1902 deed says, oh, coal operator or grantee of the right, you are allowed to remove the coal, and you are not going to be responsible for any, relieving any support. I understand. And I don't mean to interrupt, but I guess that underscores in my mind why this is such a big issue for West Virginia, you see what I'm saying? Judge Keenan. Both for the coal companies and for the individual parties. You are so right about that. I know the court's been given an amicus brief from the West Virginia Coal Association. And I know all cases that come before this court are important to its litigants. But you are so right. This case, there's a lot on the line here. You've seen the numbers in the amicus brief. You've seen what it means to the state of West Virginia. And more fundamentally, I would submit that it's important for its expectation of the parties. Expectations of parties throughout the 120 years since the Griffin decision have been relying on that decision. And not once, not once has issue come up with the exception of this case. And so I guess we, the litigants, occupy some unique positions here. But there is a lot riding on this. And that includes expectations of the parties. That includes employment of people. That includes capital expenditures. That includes tax revenue. So I know the court is very appreciative of that. I simply want to add, Your Honors, that the only justification that the lower court used, and let me get sidetracked here a little bit. Plaintiffs initially conceded our position. We filed a summary judgment motion on several issues, including the fact that plaintiffs did not have a common law right of action. In their response, plaintiffs conceded to it. And the district court, sua sponte, raised some arguments that really are the basis for the Appellee's position in this case. The pillar, no pun intended, the pillar of that defense is pretty much the Cogar decision. And this is 1989, West Virginia Supreme Court of Appeals. And really some language in there toward the end of that decision that mining methods not contemplated at the time of the severance deed may not be utilized. And Judge Keenan, this goes to your point, I think. First of all, let's talk about what Cogar really stands for. There was a statutory change, and I think you're making that point. Yes, that's exactly what I'm making. And I don't want to belabor it, but I think it's important to note that the language that the Appellees are relying on here, and that the district court relied on, I would submit is dicta. Because really the issue in the Cogar decision was a statutory enactment in the late 1970s, and whether a damage waiver, a damage waiver from 100 years before, would basically negate that waiver. Now, you're not claiming that your damage waiver goes to statutory claims? I am not claiming that, Your Honor. You're correct about that. Just the common law claims. But in Cogar, we weren't dealing with different mining methods, mining technologies. And for the Supreme Court of Appeals, I can't get into its head. I think that the verbiage that the plaintiffs or the Appellees rely on here is, for the most part, used to support the Supreme Court's position on this. But I would submit, it seems to me, that that's dicta. It's purely dicta. And in fact, it runs counter to 110 years of Supreme Court precedent. I'd like to get in for a moment into the West Virginia SMACRA scheme. And Judge Agee, I agree that there's no definitive West Virginia Supreme Court guidance on this. But if this Court were to entertain and consider and rule on the substantive issues in the case, we've got a lot to go on here. First of all, obviously, statutes need to be construed in their plain language. And in this particular case, the fact is that the operator is required to do certain things. And this is where we get into the purpose of the enactment of SMACRA. In particular, there were some hardships that I think the legislation recognized when you had these damage waivers. There was no relief afforded under the common law to subsequent buyers of these properties. So SMACRA is enacted to mitigate some of those hardships. And for that reason, it certainly serves a purpose. And it lays out, we would submit very clearly as to what the options are, what the operator has to do, and what remedies are available to the particular landowner in this particular case. One of the issues in the case is, what type of cause of action is this? Because really, SMACRA, both on the federal level and the state level, really anticipates two different causes of action. The first one is the one we submit brings us here today. That is an action to compel compliance with the Act. A separate one, and I think relied on by the district court, is simply a landowner has a cause of action. Well, in this particular case, the evidence shows, evidence of record shows that my client, McElroy Coal Company, was proactive in attempting to mitigate these damages. That it was out there, the plaintiffs were represented by counsel. I think it's important to note, we talk about damage subsidence, and there was here. This is not a catastrophic event for those that may not know the coal mining and subsidence and longwall mining. These folks were permitted to stay in their house. There was never any danger. The damage we're talking about to the house was some door frames out of square, some sloping of the floors, some window frames. There was a leak in the roof that had to be fixed. As far as the land damages go, there were some what they call slips and some minor, some slippages and changes in elevation of the land that are repairable. And this is all contemplated by the mining. But the West Virginia SMACRA and the federal scheme basically sets forth the remedies. That is, first, with regard to damage to land, not dwellings, not structures, but land, operator, you shall repair. And we've stood ready, willing, and able to repair. The second component is what happens to damage to dwellings. In this case, there's a choice. And the choice is either repair or pay for diminution in market value. And we've stood ready to honor that commitment. The record will reflect the plaintiffs. They weren't satisfied with what we were proposing to do. They got a separate lawyer, a second lawyer. Again, they've been represented throughout by counsel. A second lawyer that basically says we don't want to communicate the next thing we know we've got a lawsuit. So our position is that West Virginia SMACRA requires, first of all, simply an order to repair damage to land and not a money damage award. And second, that the operator be given a choice, whether it wants to effect the repairs itself, which we've stood ready, willing, and able to do, or to pay the landowner the difference in value, a diminution in value because of the damage to the home, which was determined to be $94,000. So assuming I read the statute the same way you do for a minute, what about the $25,000 for, wasn't there an extra $25,000 for kind of annoyance and emotion? There was, Your Honor. Yeah. And that's the part that I just can't figure out. Why is that precluded? I understand that you can read the statute to say, look, in terms of damage to the house and damage to the land, you get what you get. But I don't see anything that kind of would supplant the normal common law rule as to damages. Well, once we get out of the common law scheme where annoyance, inconvenience, loss of use may be compensable, the statute tells us what damages are available to a homeowner and a landowner in this case. Pain, suffering, inconvenience, annoyance, they're not reflected. They're not provided for. Therefore, we would submit they're not recoverable. And that all hinges on this not being an action under 22-325-F. Absolutely, it does. And how can, I cannot for the life of me figure out how F and A are supposed to work together, like how you know which is which. Let me give you an example of F. Mines are to be permitted. And let's say the area that the operator permits is circumscribed. They always are. Let's say we exceed the scope of that permit. We go into the neighboring land. There we violated the permit. The neighboring landowner is damaged by our violation. That's an F claim. That's a sub-F claim. Why isn't that an A claim? Why can't they bring an action compelling compliance because you're in violation of a rule, order, or permit issued pursuant to the agreement? We've already violated at that point. Damage has been committed. But A says it's for bringing an action to compel compliance against a person who's to be in violation also. There's a violation built into both provisions is what I'm saying. Yes, Your Honor. But it's also to compel compliance. Here the compliance is pay us. Make good on the remedy that we're seeking. Come in and repair our land. For me, I just don't understand the difference between compliance in the form of pay us and an action for damages. You know what I mean? They seem like kind of the same thing. I understand that. I'm not faulting you. I do not make sense of this statute. Why they couldn't recover under subsection F for the failure to correct material damage? Because there's been no assertion, certainly no evidence presented that we violated any SMACA rule, any permit. First, there needs to be a violation. Yes, there needs to be a violation resulting in the harm. But there needs to be a violation under A also. To compel compliance. It says against a person who's alleged to be in violation. One example. So how come they, why on your theory can they bring an action under A? Because they can say, operator, get in here and repair our land. Get in here and repair our home. Sounds like a good question for the West Virginia Supreme Court to answer. All right. You've got some time left in rebuttal. Yes, sir. Mr. McGraw. Thank you very much, Your Honors. Jeremy McGraw on behalf of the appellees. Mr. Puz indicated that there should be some contemplation of the expectation of the parties as to what the rulings and how these things are going to continue through the years. But he doesn't want to concede that there should be an expectation of the parties when they entered into these agreements, which are now 115, 120 years old in some cases. This is an issue important to West Virginia. But there is sufficient case law from the West Virginia Supreme Court of Appeals at this time that would allow this court, which is certainly very respected and certainly qualified to apply the canons of judicial construction, statutory construction to enter a ruling regarding this issue. We filed this case in state court originally. It was removed to the district court. And we elected to remain there in the district court at that time. There are a series of several cases in West Virginia which talk to this idea of you need to look at the contemplation of the parties at the time that the deed was actually executed. You've got pretty broad language in this particular deed. Obviously, they couldn't anticipate technical advances that had not occurred then. But the deed says without leaving any support for the overlying stratus and without liability for any injury. And the West Virginia Supreme Court and the district courts in West Virginia, not in this case, but in other cases, have looked at a deed language very similar, if not identical to that, and come out the other way. Why wouldn't that be a, why wouldn't we let the West Virginia Supreme Court say this is what it means in West Virginia? Because we can say what we think they would say, but when the case comes up in a different setting in a West Virginia circuit court to the Supreme Court of Appeals, they don't have to follow what we say. They can ignore it completely. And that's true, Your Honor. In fact, that's part of the issue in this case. We have some district court decisions which go one way, and I believe state court decisions which go the other way. We are in the interest of getting this case done as quick as we can at this point in terms of trying to get a quick and efficient resolution. I think the court does have the tools to look at the West Virginia Pitt-Cole v. Strong case, the Brown case, the Lowe and the Coger cases. Say, well, under your interpretation of West Virginia law, then, would all waivers of subsurface support be rendered inapplicable or unenforceable based on changes in technology? I don't think that all of them would. And I think there's cases in West Virginia that suggest that some of them aren't. The Ant Code. How about all of the old ones? In other words... All of the old ones prior to the time that longwall mining would occur, that potentially could be an issue. But I think there's the separation... And how many of those are there? There probably are a lot of those. Thousands, huh? Yes. But I think one of the distinctions that the district court made and that we want to make as well is that we're not saying you don't have the right to mine your coal. It's just a question of whether or not you're going to be responsible for the damages that result from the mining of the coal as a result of this technology that was not contemplated by the parties at the time that it was entered into. The Antco Coal and the Russell Island Creek case are both cases from the West Virginia Supreme Court of Appeals that talked about the extent of these releases. So we've got a deed that gives a mining right, but you've also got to keep in consideration that you're also dealing with a release. So you've got a deed and a release, both of which there's certain case law out there that suggests you interpret those as of the time that they were executed and what would have been the contemplation of the parties at the time that they were actually executing those agreements. In Antco Fuel, you had the case where you had both parties to the deed and both parties to the release were actually experienced in the coal mining industry. It was a 1970s era deed. The court said it's not ambiguous. The trial court found that the language at issue was not ambiguous at all. The Supreme Court did not make any finding of ambiguity, did not suggest any ambiguity in the interpretation of that language. But it still went on to look at the circumstances of the parties and what they would have contemplated at the time. And it looked at the fact that it was a 1980s era deed and the fact that both parties were interested in the coal industry involved. And the same thing happened in the Russell Island Creek case where you're talking about the water damages and whether or not the release covered any releases related to the damages to the water as a result of the surface mining on the separate property. The person who signed the release, executed the deed, was interested in the coal, had an interest in coal mining, had been in the industry and knew at the time that they signed the lease that the source of the water came from the property that they were selling. So I think there are cases in West Virginia which do clearly show that regardless of the ambiguity issue, the court will look at the contemplation of the parties at the time and determine what would have been the reasonable expectations. And if there's something that could not have been comprehended by the parties, that's not something that they're going to be bound to have released through that deed a hundred years ago at that point. That's certainly the way we would look at that case. And there are other cases from other states that involve that same type of analysis which are mentioned in the briefs. The cases that have gone through the district court system that have seemed to have come up with different resolutions of that issue only reach that ambiguity issue. They've never gone on to actually make a ruling with regard to the contemplation of the parties at the time that those agreements were actually entered into. As I said, Your Honors, you've got the issue of the deed construction, but you've also got the issue of the construction of the release. And the West Virginia case law is very clear, Conley v. Hill and a couple of other cases that a release will ordinarily only cover matters as they are fairly said to have been within the contemplation of the parties at the time it was actually executed. The Pittsburgh coal case v. Strong used that in terms of strip mining, said the strip mining would not have been contemplated at the time, not permitted. The Brown v. Crozer coal case did the same with regard to auger mining in my home county of Wyoming County. And then the Lowe v. Guy and Eagle Coals case in the 1980s did the same thing with regard to whether or not changes in technology with regard to right-of-ways and the type of hauling and mechanism used for hauling coal would have been contemplated by the parties at the time that they entered into the agreement. Each of those cases, fairly clear language, language I would submit is even more clear than the appellant relies on in this case in support of their argument. Well, what is ambiguous about the language in your deed? I would argue that the idea of necessary and useful is frankly ambiguous. What is necessary and useful to the mining of coal? Who gets to make that decision? The strip mining cases dealt with a scenario where the only way to get to that mineable coal was to totally just take off the top of the mountain, get to the coal underneath and dig out the coal. Is that necessary and useful? Would technology change at some point where that would not be what was necessary and useful? I'm just not sure that there's real clarity as to the terms necessary and useful as to who gets to decide that under what circumstances, under what parameters. Is it purely economical? What's ambiguous about the liability part without leaving any support, without liability for any injury? I believe that would be because in 1902, any support would have meant that there was support because they did not mine without any support at that point. Now, there may be areas of the property that there may be support gone in certain areas, but there was coal left behind at that point. So, you look at the circumstances, the contemplation of parties. I do a lot of oil and gas related law. You see a lot of deeds that will say someone reserved or accepted one-eighth oil and gas. That doesn't mean one-eighth of the oil and gas. It typically meant the royalties from the oil and gas because at the time that that was being used, the parties understood one-eighth mean royalties, not to mean an actual one-eighth fractional interest in the actual minerals that were being conveyed. So, I think any, and without leaving support, still has to go into the context of what the parties would have understood at the time. And certainly in 1902, they would not have understood that everything was going to be gone and it was almost certain that there would be subsidence on your property. There was still a chance that you may not have any subsidence related to the pillars under your property and the type of mining that was occurring at that time, which was not full extraction. There was still coal left underground at that time. We certainly believe that those issues support the idea that there are common law damages. The common law damages would get you to the repair, the annoyance, inconvenience, loss of use and all those things. But we also certainly believe that the regulatory sections in West Virginia do provide that you can recover those types of damages under the regulatory scheme. Do we have any West Virginia case law on any of this? There is no West Virginia case law on SMACRA or the West Virginia SMACRA. There is the general West Virginia case law on how you interpret statutes. There is case law in West Virginia that does demonstrate, I think the ANCO fuel case says that SMACRA is remedial. It's intended to protect the property owners. There's a statement of legislative intent in the code section that says it's for the protection of people. When you have these types of remedial statutes, you're supposed to interpret those statutes as broadly to reach the purpose of the statute, which is the protection of the public. So if you're dealing with a regulation that's titled surface owner protection and a remedial legislative scheme and you've got this ambiguity as to who actually does make this choice between repair or compensation of the land. When you have something that is as widespread as coal mining is in West Virginia and the, if not possibility, the probability that these claims recur fairly frequently and you have no state law interpreting the state statute or the state regulations, why wouldn't we ask the state's highest court to decide all those things? Because once they decide it, we're bound by it. Yes, Your Honor. But whatever we decide doesn't necessarily mean anything to them and they aren't bound by it. To be frank with you, Your Honor, I think this issue in litigation, especially within the mining laws, has been one of those game of chicken issues between the plaintiffs and this ultimate issue. I can tell you in terms of the settlement of a lot of these cases, these arguments go back and forth all the time and there's a settlement somewhere in between. And to be honest, Judge, I think there is an element of fear on both sides, the plaintiff's bar and the people who defend the coal companies in these cases as to what the ruling is going to be and how it's actually going to turn out and what arguments you're going to have later on in the future. So I understand the idea that perhaps the West Virginia Supreme Court should be the one making the decision, but this Court does have the tools necessary to make a decision and to resolve some of these issues and it would not be necessarily mandatory binding authority on the West Virginia Supreme Court, but it certainly would be persuasive representation of authority of what, you know, honorable courts are thinking about these issues and how they're proceeding. Anything else you want to tell us about? No, thank you, Your Honor. I think a lot of it's in the briefs. I don't want to belabor any other points unless the Court has any other questions. Mr. Puz, what else do you want to tell us? Thank you, Your Honor. I simply want to address one point that Judge Keenan got into here a little bit. In this particular case, this is the common law issue and the validity of the subsidence and damage waiver. In this particular case, the district judge said that the waiver was a nullity. And in this particular case, the district judge said the remedy would be simply a cause of action for damages. We can make no mistake that if that decision stands, the next legal lawsuit will not be an action for damages, but it will be one for injunctive relief where a landowner whose property is subject to one of these waivers comes into court and says the coal company is coming my way, this entire mining operation needs to stop because they have no rights to undermine my property. And as I said, there's a lot on the line with this case and there will be a lot on the line with that particular case. And so simply because the district judge here said the remedy is cause of action, the next one will be one for injunctive relief. I'll answer any further questions that the court may have. If not, I'll wrap up my time. Thank you very much. Thank you.
judges: G. Steven Agee, Barbara Milano Keenan, Pamela A. Harris